*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* ESTATE OF VIRGIL F. HOPPERT.

GLEN HOPPERT,

Petitioner-Appellee,

v

DALE A HOPPERT, Individually, and as Personal Representative of the ESTATE OF VIRGIL F. HOPPERT,

Respondent-Appellant.

FOR PUBLICATION
June 29, 2023
9:00 a.m.

No. 362694
Monroe Probate Court
LC No. 2021-000221-DE

Before: SWARTZLE, P.J., and CAVANAGH and LETICA, JJ.

PER CURIAM.

Respondent, Dale A. Hoppert, individually and as personal representative of the Estate of Virgil F. Hoppert, appeals by right an order granting summary disposition under MCR 2.116(C)(9) (failure to state a valid defense to the claim) to petitioner, Glen Hoppert. The trial court granted the latter's petition to return property to a previous estate and allow him a fresh set of days to exercise his purchase option, which otherwise would have expired. On appeal, respondent challenges both the legality of the restriction agreement and, alternatively, petitioner's performance in meeting the agreement's purchase-option deadline. Because petitioner did not meet the deadline and should not be granted additional time to do so, we reverse and remand.

## I. BACKGROUND

This case arises out of a restraint on alienation that provided petitioner with an option to buy certain real property upon the death of another holding an interest in that property. Respondent had been deeded the property before petitioner exercised this purchase option.

## A.  THE RESTRICTION AGREEMENT

Norman and Edith Barkenquast, grandparents of the parties, owned and farmed the two parcels of real estate at issue in this case.  They had two daughters, Kathleen Hoppert and Linda McKinney.  On January 3, 1989, the Barkenquasts executed a quitclaim deed, granting their daughters the property as joint tenants while retaining life estates for themselves.  Petitioner was the eldest son of Kathleen, while respondent was her second son.  The Barkenquasts granted petitioner the option to purchase the fee title interest "in all of the property within nine months of the death of his last surviving maternal grandparent, either Norman or Edith."

On June 8, 2001, petitioner exchanged this option for a new agreement with Kathleen and Linda, purchasing a one-third interest in the property from Kathleen and Linda for $80,000.  He obtained farming rights over all of the property.

A "Real Estate Restriction Agreement" was incorporated into the purchase agreement.  The agreement stated that Kathleen, Linda, and petitioner were "the 'Parties' " and "equal one-third (1/3) tenants in common."  The agreement uses the term "Party" for Kathleen, Linda, or petitioner, and "non-Party" for any other interest holder that might arise.  The real estate involved was described as two parcels in Ida Township that together contained about 86 acres.  The restriction agreement stated that it would "restrict and restrain" transfers "except as otherwise specifically provided and allowed by this Agreement."  The agreement further stated that it was establishing "rights, restrictions and obligations . . . in the event of a Party's voluntary wish to sell, involuntary transfer, or death."  The agreement additionally stated that the Parties may not "transfer, assign, encumber, pledge, sell, devise, give or otherwise dispose of part or all of their interest in and to the Real Estate interest . . . except pursuant to the terms of this Agreement," and that "[a]ny such Disposition contrary to the terms of this Agreement shall be null and void and have no effect whatsoever."

The restriction agreement established that, upon the death of any Party, the surviving Parties would have the option to purchase the deceased Party's interest.  A timeline for exercising this option was set forth as follows:

> If the surviving Parties elect to exercise their option to purchase the interest of the deceased Party, they shall serve notice in writing of such election upon the deceased Party's personal representative and/or trustee within sixty (60) days after the death of the Party.  If all of the surviving Parties, as a group, do not elect to purchase the interest of the deceased Party, then the surviving Party who wishes to purchase all of the deceased Party's interest in the Real Estate, shall serve notice in writing of such election upon the personal representative of the deceased Party within thirty (30) days after the surviving parties, as a group, decline to exercise their option to purchase their "pro-rata" share of the deceased Party's Real Estate interest.  If none of the surviving Parties elect to purchase the interest of the deceased Party, then the deceased Party's personal representative and/or trustee may dispose of or transfer the deceased Party's interest in the Real Estate to a non-Party consistent with the terms and provisions of the deceased Party's estate planning directives or may sell such interest to a non-Party pursuant to a bonafide offer, however, pursuant to and consistent with the terms and procedures of paragraph 3 below.

Paragraph 3 then describes the process for a sale of a Party's interest. First, a "bonafide offer" must be established, and written notice of it "shall immediately" be provided to the other Parties. Upon receipt of that notice, the other Parties exclusively had 30 days to elect to purchase the selling Party's interest themselves. "If the other Parties fail to timely exercise their option, then the selling Party may sell his or her interest in the Real Estate to the proposed purchaser . . . ." Paragraph 4 describes the process for involuntary transfers. Paragraph 5 describes the process for voluntary transfers to another original Party.

The restriction agreement also provides for persons who are not original parties who later acquire interests in the property. That person "and his or her spouse, if any" are bound by the agreement as if that person were an original Party, except that he or she "shall not be entitled to notice or a purchase option under any other provisions in this Agreement, other than as a third Party purchaser." The agreement provides that, unless all Parties agree to a different price, then two times the state equalized value is to be used as the fair market value of the property, with the buyer paying the appropriate percentage of that. Payment terms are set as 10% due in cash at closing, with 20 equal quarterly payments due thereafter with an 8% interest rate.

The restriction agreement, in Paragraph 9, states that if an "interest of a Selling Party is not purchased or disposed of pursuant to the foregoing options, the Real Estate interest shall be and remain subject to all of the terms, provisions and restrictions of this Agreement." The agreement, in Paragraph 12, further provides that it was to terminate when there is only one remaining Party holding an interest in the property, or upon unanimous agreement of the Parties still holding an interest. The agreement, in Paragraph 15, states that it is "binding upon all Parties hereto, their respective spouses, successors, assigns, heirs, personal representatives and legal representative."

Paragraph 18, titled "Acceptance of Terms by Spouses," states that the spouses of the Parties have read the agreement, waived and relinquished all rights of election and dower in the property, agreed to join in executing any amendments "necessary to accomplish the purposes of this Agreement," and permit "their Party spouses to sell, transfer, dispose, and otherwise restrict their undivided interest in the Real Estate during their life time and upon their deaths in accordance with the terms of this Agreement." The agreement set forth labeled places for the Parties and their spouses' signatures, and the only line unsigned was for Virgil, who was the husband of Kathleen. All signatures are dated July 9, 2001.

In exchange for being allowed this purchase from Kathleen Hoppert and Linda McKinney, on July 9, 2001, petitioner released his option to purchase granted by the Barkenquasts on January 3, 1989. Martin Kamprath was the attorney who prepared all of these documents related to the exchange.

## B. TRANSFERS AND DEATHS

Petitioner claimed that in 2016 Kathleen's "capacity was suspect." Petitioner's and respondent's sister, Kay Hehl, described the ways that Kathleen was still competent in 2016, and how petitioner had been estranged from the rest of the family, which led to Kathleen changing her wishes about the property. On December 21, 2016, Kathleen executed a quitclaim deed transferring her interest in the property from just herself to herself and her husband, Virgil. Attorney Kamprath prepared this deed. According to petitioner, Virgil "took Kathleen from the

hospital to" Kamprath. Hehl disputed that, stating that Kathleen's hospitalization was "two months" after the deed was prepared. The trial court noted that this deed was contrary to the terms of the restriction agreement. When later "confronted by Linda about the legality of the quit-claim deed that had been prepared by him," Kamprath allegedly described the situation as a "nightmare." Kathleen died on February 26, 2017. Petitioner did not offer to buy her interest.

On June 15, 2018, Virgil executed a quitclaim deed that gave his interest in the property to respondent for no consideration. This deed was prepared by attorney Melissa Matiash. Petitioner stated that, after the latter conveyance, Virgil told him that respondent "was his personal representative and everything would be taken care of regarding the 1/3 interest going to petitioner." Petitioner further stated that Virgil did not inform him or Linda of the deed. After speaking with Virgil about the property, petitioner believed "at the worst" that he could exercise his purchase option when Virgil died.

Virgil also signed his will on June 15, 2018. The will lists five offspring: petitioner, Karen Appling, respondent, Kay M. Hehl, and Lori Crimmins. Article II of the will sets forth specific bequests of real estate, and creates a scheme that differs depending on which property his children own at his death, with certain monetary offsets to be paid to certain children if property is given to another of the five children. Respondent's bequests depend on respondent still owning "the ten (10) acres West of and adjacent to the West line of my homestead farm as he does at the time of my execution of this Will." Karen, respondent, Kay, and Lori are all involved in this article. Petitioner is not involved in any of the specific bequests. The residuary provision gives equal shares to each child. Respondent is named as the first candidate for personal representative.

Virgil died on January 31, 2021. Petitioner stated that he "discovered [respondent's] interest when he checked the taxes in February, 2021, and discovered that [respondent's] name was on the tax bill." The two 2020 property tax bills were due on February 16, 2021, and both appear to have been paid on time. One lists petitioner's name, a state equalized value of $195,500, and a bill for $1,237.57. The other lists respondent's name, a state equalized value of $91,900, and a bill for $317.90. Kay Hehl stated that petitioner told her "he just discovered at the township office that [respondent's] name was on the deed" approximately two weeks after Virgil's death. She stated that he then said, " 'I messed up.' "

Petitioner reported that Linda called Kamprath on March 29, 2021 to discuss the restriction agreement and quitclaim deeds. According to petitioner, Kamprath "said the whole situation was a nightmare and concluded that there really wasn't anything that [Linda] could do about it and 'we would just have to live with it.' " On April 13, 2021, respondent filed a petition for informal probate. Respondent was appointed personal representative and then published the notice to creditors.

## C. PETITION FOR SALE

On May 21, 2021, petitioner filed his petition to compel the sale of the subject property to him. He stated that Linda had given 20% of her interest to him, and had "told him she would leave the balance to him in her will." Petitioner characterized the deed from Virgil to respondent as a cloud on title, and asked the court to declare the property interest an asset of Virgil's estate.

-4-

Petitioner further asked to exercise his option to buy the property interest for 1/3 of two times the state equalized value, currently $191,600.

Respondent filed a response, arguing that the restriction agreement was an illegal restraint on alienation insofar as it "has an unlimited duration." Respondent alternatively argued that petitioner's failure to exercise his option within 60 days of Kathleen's death waived any rights he might have had, and that petitioner had waived his rights by not exercising his option within 60 days of Virgil's death.

On February 28, 2022, petitioner filed a motion for summary disposition under MCL 2.116(C)(9), arguing that respondent failed to state a valid defense to his claim. The motion asked the court to: abrogate the deed from Virgil to respondent, find that title vested in Virgil's estate, and require sale of the property to petitioner. Respondent opposed the motion. On April 13, 2022, an affidavit from Kay Hehl was filed with the trial court, explaining that Hehl would be unable to attend the upcoming hearing because of work, and was submitting the affidavit instead.

A hearing was held on April 19, 2022. In addition to the instant parties' respective personal counsel, an attorney for Virgil's estate appeared, representing respondent in the latter's role as personal representative. Petitioner's counsel argued that the Barkenquasts had "made it clear that they wanted to reward [petitioner] for having gone into the family business, to have run this farm for the . . . 40 years that he ran this farm," and that petitioner had "worked his whole life for this property." Petitioner's counsel stated that petitioner was not attempting to cancel the transfer from Kathleen to herself and Virgil, but was trying to void the transfer from Virgil to respondent.

Describing petitioner's actions upon Kathleen's death with regard to the transfer to Virgil, counsel stated, "he made the choice to wait it out, he was persuaded by Kamprath saying that he just had to live with it, which probably wasn't good advice, but because [the restriction agreement] was so well drafted it didn't matter." Respondent's counsel stated that there was no evidence presented "that Marty Kamprath ever said anything, that [petitioner] knew or didn't know anything," or about what Mr. Barkenquast or Kathleen "had wanted 20 years ago." Respondent's counsel asserted that notice of petitioner's decision to exercise his option was received approximately 100 days after Virgil's death, past the number of days allowed for exercising the option. Petitioner's counsel acknowledged that the notice was received past the number of days allowed for exercising the option, adding, "I'm not sure of the exact number of days."

Respondent's counsel stated that petitioner's relationship with Kathleen and Virgil had changed since the restriction agreement was executed, which was why they updated their estate plan. Counsel stated that the affidavit from the parties' sister would explain the change in the estate plan.

Petitioner's counsel argued that a motion under MCR 2.116(C)(9) was to be based only on the pleadings, and so the affidavit should not be considered. Petitioner's counsel further argued that, because respondent held the property interest, the option time limit would not begin to run until it was returned to Virgil's estate. He also asserted that respondent would not have allowed the sale, which would have made petitioner's giving notice to him "superfluous." The trial court stated that it would not review the affidavit of the parties' sister because the motion was brought under MCR 2.116(C)(9).

The attorney for Virgil's estate argued that petitioner had been given several chances to exercise an option to buy the property, and had failed to timely use any of them. The trial court noted the equitable concern that petitioner had invested in buildings and equipment with the intention of continuing to farm the property. The attorney for Virgil's estate stated that, when the restriction agreement "was originally signed, it was well known that Virgil was not in agreement with that." Petitioner's counsel confirmed that he was not arguing against the transfer from Kathleen to Virgil.

## D. THE TRIAL COURT ORDER

On August 2, 2022, the trial court granted petitioner's motion for summary disposition, in part. First, the court considered respondent's defense that the restriction agreement constituted an illegal restraint on alienation. The court noted that petitioner had obtained his option in a reasonable, bargained-for exchange—which was legal. He gave up an option to purchase all of the property, and became a tenant in common with a future opportunity to obtain all of the property. Essentially the parties entered into an option or right of first refusal contract. The court noted that this case did not involve a land contract or "a vendor who wanted to protect against missed payments," and observed that petitioner had "reasonably relied upon the agreements, farming the property and making significant improvements." The trial court noted that although Virgil had not signed the restriction agreement, that did not make the restriction agreement unreasonable; the property interest had been gifted to only Kathleen by her parents. Moreover, the court held, the transfer from Kathleen to Virgil was void as in contravention to the restriction agreement entered into between petitioner, Kathleen, and Linda. Thus, the trial court concluded that respondent's defense—that the restriction agreement constituted an illegal restraint on alienation—was without merit.

Second, the trial court considered respondent's defense that petitioner missed the deadline to purchase the subject property thereby waiving any such right to purchase. The trial court acknowledged that petitioner had not exercised his option to purchase after Kathleen's death, and excused this on the ground that "by the time Kathleen had died, she had already clouded title to the property by recording the void quit-claim deed, which transferred her interest to herself and her husband, Victor [sic], as joint tenants with rights of survivorship." The trial court also noted that petitioner retained his option as to non-party interest holders, such as Virgil, as set forth in Paragraph 2 of the agreement.

Third, the trial court rejected respondent's defense that the agreement did not give an option after the death of a non-party interest holder. The court noted that the agreement contained "no prohibition of the parties purchasing a share from a non-party." To the contrary, Paragraph 6 referred to a non-party's obligations if he wished to sell. In any case, the court held, Kathleen violated the restriction agreement by deeding the property to her husband Virgil; therefore, that transfer was void. Accordingly, Virgil owned no property as a consequence of the deed and had no legitimate property interest to deed to respondent.

The trial court noted that this case turned on contract law and concluded that "the original parties entered into a legitimate contract affecting their interests in real estate, and the court must uphold the same." It then offered two alternative courses of action. First, Kathleen's estate could be reopened with the subject property interest as part of it, with petitioner given 60 days after the

appointment of a personal representative to exercise his purchase option as set forth in the restriction agreement. Alternatively, the property interest could be treated as vested in Virgil's estate (as if the Kathleen conveyance had been valid) and petitioner would be given 60 days to exercise his purchase option. Accordingly, petitioner's motion for summary disposition was granted in part.

This appeal followed. Respondent argues that the trial court erred in finding that the restriction agreement did not constitute an illegal restraint on alienation when it prohibited the parties from selling or otherwise alienating their interest in the property for at least 30 days and up to 90 days. Further, respondent argues, the trial court erred in allowing petitioner to enforce the restriction agreement, giving him an opportunity to purchase the property when he failed to follow the terms of that agreement. The parties agreed to stay the matter, and maintain the status quo use of the property, pending appeal.

## II. ANALYSIS

### A. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *In re Smith Trust*, 480 Mich 19, 23-24; 745 NW2d 754 (2008). "When deciding a motion under MCR 2.116(C)(9), which tests the sufficiency of a defendant's pleadings, the trial court must accept as true all well-pleaded allegations and properly grants summary disposition where a defendant fails to plead a valid defense to a claim." *Slater v Ann Arbor Pub Sch Bd of Ed*, 250 Mich App 419, 425; 648 NW2d 205 (2002). Only the pleadings may be considered. MCR 2.116(G)(5). "Pleadings include only complaints, cross-claims, counterclaims, third-party complaints, answers to any of these, and replies to answers." *Slater*, 250 Mich App at 425. Documents attached to the pleadings are considered part of the pleadings for purposes of MCR 2.116(C)(9). See *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 163; 934 NW2d 665 (2019), citing MCR 2.113(C). "Summary disposition under MCR 2.116(C)(9) is proper when the defendant's pleadings are so clearly untenable that as a matter of law no factual development could possibly deny the plaintiff's right to recovery." *Slater*, 250 Mich App at 425-426.

This Court also reviews de novo the proper interpretation of a contract as a question of law. *In re Smith Trust*, 480 Mich at 24. "When a court interprets a contract, the entire contract must be read and construed as a whole." *Smith v Smith*, 292 Mich App 699, 702; 823 NW2d 114 (2011). "All the parts must be harmonized as much as possible, and each word of the contract must be given effect, if possible." *Id*. "If the contractual language is unambiguous, courts must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law." *In re Smith Trust*, 480 Mich at 24.

### B. LEGALITY OF RESTRICTION AGREEMENT

The trial court concluded that the restriction agreement did not constitute an illegal restraint on alienation. We agree.

MCL 554.44 states, "All grants and devises of lands, made to 2 or more persons, except as provided in the following section, shall be construed to create estates in common, and not in joint tenancy, unless expressly declared to be in joint tenancy." MCL 554.45 states, "The preceding

section shall not apply to mortgages, nor to devises or grants made in trust, or made to executors, or to husband and wife."

"A restraint on alienation of property is defined as an attempt by an otherwise effective conveyance or contract to cause a later conveyance (1) to be void (disabling restraint), (2) to impose a contractual liability upon the conveyance for conveying in breach of the agreement not to convey (promissory restraint), or (3) to terminate all or part of a conveyed property interest (forfeiture restraint)." *LaFond v Rumler*, 226 Mich App 447, 451; 574 NW2d 40 (1997). "Michigan recognizes a strong public policy against restraints on alienation." *Albro v Allen*, 434 Mich 271, 281; 454 NW2d 85 (1990). "Michigan follows the common-law rule against unreasonable restraints on alienation of property." *LaFond*, 226 Mich App at 451. As the *LaFond* Court also noted:

> The Restatement, Property, § 406, p 2406 (1944), specifies that a restraint is permissible if it is reasonable under the circumstances:
>
> "*i. Reasonableness.* Even though a restraint on alienation is a forfeiture or promissory restraint and is qualified so as to permit alienation to some though not all possible alienees, the restraint must still be found to be reasonable under the circumstances." [*LaFond*, 226 Mich App at 453 n 2.]

Some cases involving fee simple estates passed through a will indicate that restriction agreements are not permitted at all, sometimes using language which could extend to other property situations as well. In *Mandlebaum v McDonell*, 29 Mich 78, 79-81 (1874), the restriction provision in a will did not allow selling the bequeathed property for 21 years, and after that for as long as the decedent's wife still lived. The Supreme Court took a firm stance against restraints on alienation:

> We are entirely satisfied there has never been a time since the statute *quia emptores* when a restriction in a conveyance of a vested estate in fee simple, in possession or remainder, against selling for a particular period of time, was valid by the common law. And we think it would be unwise and injurious to admit into the law the principle contended for by the defendants' counsel, that such restrictions should be held valid, if imposed only for a reasonable time. It is safe to say that every estate depending upon such a question would, by the very fact of such a question existing, lose a large share of its market value. Who can say whether the time is reasonable, until the question has been settled in the court of last resort; and upon what standard of certainty can the court decide it? Or, depending as it must upon all the peculiar facts and circumstances of each particular case, is the question to be submitted to a jury? The only safe rule of decision is to hold, as I understand the common law for ages to have been, that a condition or restriction which would suspend all power of alienation for a single day, is inconsistent with the estate granted, unreasonable and void. [*Id*. at 107.]

"If one's interest in property is absolute, as a fee simple, restriction on his right of alienation is void as repugnant to the grant. This is because violation of the restriction affects no interest but his own." *Sloman v Cutler*, 258 Mich 372, 374; 242 NW 735 (1932). "Where the grantor retains

an interest in the property granted, such as reversionary interest to him as lessor, the interest generally will support the imposing of a restriction on alienation." *Id*. at 374-375.

Later cases have still found restraints illegal, without using as strong of language condemning all restraints. These cases involved joint tenancy or tenancy in common, instead of singular fee simple owners. In *Braun v Klug*, 335 Mich 691, 692; 57 NW2d 299 (1953), the defendants deeded land to the plaintiffs. The deed provided that the land would " 'not be sold to anyone except grantors herein or their heirs, representatives or assigns. It is agreed that this covenant shall run with the land.' " *Id*. The plaintiffs claimed that this provision was "an unreasonable restraint upon the power of alienation." *Id*. at 694. The Supreme Court agreed, ruling, "Such condition restricts the number of potential buyers. It is repugnant to the grant and a restraint on the inherent right of alienation and therefore void." *Id*. at 695.

In *Smith v Smith*, 290 Mich 143, 146; 287 NW 411 (1939), Joseph Smith made a joint tenancy of a set of apartments with his son, Douglas Smith. The following provision was included in the deed:

> "It is a part of the consideration for which this deed is given that neither of the parties of the second part hereto shall or can sell, deed, mortgage, or in any way incumber or dispose of his interest in said premises or any part thereof without the consent of the other party in writing." [*Id*.]

The Supreme Court held that "the restrictive paragraph was repugnant to the grant and a restraint on the inherent right of alienation and therefore void." *Id*. at 157.

The *LaFond* case involved a land contract sale. *LaFond*, 226 Mich App at 448-449. When reviewing land contract restraints on alienation, courts take a "measured approach and have focused on the reasonableness of the restriction at issue." *Id*. at 453. "[N]onassignability provisions in land contracts exist for the benefit of the vendor to safeguard performance. Under reasonable circumstances, these restrictions will be enforced solely for that purpose." *Id*. at 455. Assignments can be prevented if they would result in waste, impairment, or loss of security. *Id*. at 454. They cannot be prevented if the assignees would continue to provide the benefit under the contract that the party bargained for. *Id*. The provision at issue in *LaFond* "was drafted with one particular transaction in mind and without anticipation of other contingencies." *Id*. at 455.

The provision did "not restrict plaintiff's right to sell the property, but it does restrict her right to sell the property at the price she chooses." *Id*. at 455-456. An "appraiser may decide that the property is worth more than a new purchaser is willing to pay, hence disrupting a prospective sale and in effect creating an unreasonable restraint on alienation." *Id*. at 456. In *Pellerito v Weber*, 22 Mich App 242, 245; 177 NW2d 236 (1970), this Court had pointed to there being no "allegations of waste or impairment or loss of security" in support of the Court's decision that a clause of the contract was unreasonable in attempting to bring about a forfeiture of the conveyance. In *LaFond*, this Court quoted that reasoning in concluding that "the addendum in this case exceeds the appropriate considerations of 'waste or impairment or loss of security' of the vendor's interest and the stability of real estate titles and interjects profit as a factor in the alienation of the property." *LaFond*, 226 Mich App at 456-457. This Court found the restraint unreasonable. *Id*. at 457.

The case of *Lantis v Cook*, 342 Mich 347; 69 NW2d 849 (1955), involved an option clause in a warranty deed that had granted property to a married couple (the grantees) jointly with right of survivorship. *Id*. at 349 (SHARPE, J., dissenting). The option clause stated:

> "If the [grantees] do not wish at any time to use the property as a home, the [grantors] shall have the first privilege to purchase the above described property at any future time at the price stated in this deed, viz., Four Thousand Dollars." [*Id*.]

An issue arose when the plaintiffs, the grantors, attempted to exercise the option because the value of the property rose to $12,000. *Id*. at 350. The *Lantis* Court noted the strong anti-restraint language found in earlier fee simple cases, stating that the "common law rule prohibit[s] direct restraints on alienation for any period whatsoever, however short." *Id*. at 355. However, the *Lantis* Court distinguished the option before it holding that "a preemptive option with fixed price is not void in Michigan." *Id*. at 356. The Court quoted 2 Simes, Future Interests, § 462, p 304:

> "Practical alienability might, in some instances, be restrained by such a contract, *but its primary purpose is to enable a particular person to buy, not to prevent any one from selling*; and doubtless the owner could alienate his property subject to the option if he wished." [*Id*. at 357.]

The *Lantis* Court defined a preemptive option as a "first-right-to-buy option to arise only if the optionors desire to sell . . . ." *Id*. The option at issue was found to not even be preemptive because it was triggered by the more expansive condition of the grantees not wishing to use the property as a home. *Id*. at 358. "Such an option, exercisable upon the happening of a condition precedent, is not regarded as a direct restraint on alienation and is everywhere held valid even though it specifies a fixed price . . . ." *Id*. The primary purpose of the option was simply to enable a particular person to buy the property, not to prevent its sale. *Id*. at 359. Therefore, the Court held, the option was not an illegal restraint on alienation. *Id*. at 357.

"A right of first refusal, or preemptive right, is a conditional option to purchase dependent on the landowner's desire to sell." *Randolph v Reisig*, 272 Mich App 331, 336; 727 NW2d 388 (2006). "[R]ights of first refusal must contain a definite time for performance. Such agreements are not void, however, merely because they lack a specific time for performance." *Id*. at 336-337. "Rather, in the absence of a specific time, courts will construe agreements 'to be for a reasonable period of time,' and, thus, such agreements are valid only for a reasonable period." *Id*. at 337, quoting *Brauer v Hobbs*, 151 Mich App 769, 777; 391 NW2d 482 (1986). "There is a strong tendency to construe an option of preemption to be limited to the lives of the parties 'unless there is clear evidence of a contrary intent.' " *Randolph*, 272 Mich App at 337, quoting *Brauer*, 151 Mich App at 779 (quotation marks and citations omitted).

In *Randolph*, property owners belonging to an owners' association entered an agreement that included the following:

> "D. That any party or parties owning any land covered by this agreement and who desire to sell their property and to discontinue their summer residence on such property, before entering into any binding agreement to sell any of said property to any person or persons not an owner of and summer resident on land covered by this

-10-

agreement, will notify in writing all the then owners of the land covered by this agreement and directly bordering upon the parcel of land which it is thus desired to sell, of their intention to sell such property and shall give the parties so notified, or any of them, the first option to buy the said property for a period of fifteen (15) days from the date of mailing such notification." [*Randolph*, 272 Mich App at 334.]

The agreement set forth

a clear intent that the right of first refusal run with the land and bind all heirs "until January 1, 1960, at which time such covenants shall be automatically extended for successive periods of ten (10) years" unless a majority of the then owners agreed to change the covenants. . . . There is nothing indefinite about the initial term, and there is nothing indefinite about the successive terms. [*Id*. at 337-338.]

This Court held that the agreement therefore did not violate the rule against indefinite times of performance for rights of first refusal. *Id*. at 338.

In this case, we agree with the trial court's conclusion that the restriction agreement did not constitute an illegal restraint on alienation. While our historical case law is not the model of clarity on the issue, as our Supreme Court and this Court have held—consistent with modern contract law and freedom-to-contract principles—restraints on the power of alienation are reviewed for reasonableness. See *Braun*, 335 Mich at 694; *LaFond*, 226 Mich App at 451.

Respondent challenges several aspects of the restriction agreement. First, he argues that the length of time it requires an interest holder to wait before completing a transfer is too burdensome. This argument is unconvincing. The longest amount of time the agreement allows a party to exercise an option is 90 days, in the event of the death of a party. There, the surviving parties would have up to 60 days to decide whether to collectively buy the interest, and if deciding against collective purchase, each party has an additional 30 days after that decision to decide whether to buy it individually. Given a prospective buyer's need to arrange for financing, and otherwise weigh the decision whether to buy, those timing specifications are not unreasonably lengthy.

Respondent expresses greater concern about the length of time that the restriction agreement might stay in effect, or that "the right of first refusal is indefinite." He characterizes it as extending into perpetuity, because it does not list a specific number of years it will be in effect. Yet the agreement does describe a termination date, just not in the form of a set number of years. The agreement was signed on July 9, 2001, and states that the agreement terminates when there is only one original party still holding an interest. There were only three original parties: Kathleen, Linda, and petitioner. The agreement would therefore terminate, at the latest, after two of them died and their interest in the subject property were distributed from their estates. Kathleen died on February 26, 2017. The agreement is now set to terminate upon the death of only one of either Linda or petitioner. While the record does not disclose the ages of Kathleen and Linda at the time of the agreement, they appear to have been old enough that Kathleen's death in 2017 was not a surprise. Setting the termination date to the length of a person's life is reasonable. See *Randolph*, 272 Mich App at 337 (indicating that preemption options set to the lives of the parties are reasonable, and could even be reasonable beyond that if a clear intent to do so was present). This

agreement also does not have a renewal provision. The length of the agreement is thus not unreasonable.

Respondent also appears to take issue with the frequency of events that could give rise to an option for the original parties. The agreement sets forth an option for the original parties every time a transfer occurs, whether the transferor is an original party or new one. Respondent points to the multiple events that occurred already and arguably gave petitioner an option: Kathleen's transfer to herself and Virgil, Kathleen's death, Virgil's transfer to respondent, and Virgil's death.

It is inaccurate to describe all of those transfers as giving rise to an option. Under the interpretation of the trial court, the Kathleen and Virgil transfers were invalid and therefore need not even be considered. The agreement also allows transfers upon only death, sales, involuntary transfers, and transfers to an original party. Even the Kathleen and Virgil transfers only involved family members. The four possible option events have not demonstrated an agreement allowing for overly frequent options, given the 20 years over which they have occurred. By starting with only three original parties and restricting the ways that the property may be transferred, the agreement ensured that it would not give rise to constant option-triggering events. The range and frequency of options were not unreasonable.

Restraints on alienation that have been found to be illegal can be distinguished from this one. Non-assignability provisions in land contracts that limit the buyer's assignment rights beyond what is necessary to protect the benefits for which the seller bargained are not valid. See *LaFond*, 226 Mich App at 454. That the instant agreement did not involve a land contract seems a distinction that makes no difference, but not having the option would deprive petitioner of a benefit he bargained for. Petitioner traded away his previous option, along with $80,000, in order to obtain his property interest and new option. The *LaFond* case involved a badly drafted, inflexible provision that potentially resulted in a price so high that no buyers could be expected to come forward. *LaFond*, 226 Mich App at 455-456. To the contrary, the agreement at issue in this case had a well-thought-out pricing scheme that allowed any bona fide buyer to offer a price worthy of consideration. The *Braun* case involved a provision allowing sales to only the grantors and their heirs, representatives, or assigns. *Braun*, 335 Mich at 692. To the contrary, the agreement at issue here allows sales to anyone, merely giving the original parties special options to buy as well. The deed at issue in *Smith* did not allow any disposal without the consent of both joint owners. *Smith*, 290 Mich at 146. The agreement at issue here does not require such consent: when one owner wishes to dispose of his or her interest, the remaining owners have an opportunity to obtain that interest, but may not simply prevent disposal in the first instance. Finally, the decision in *Mandlebaum*, 29 Mich at 107, turned on a restraint of the "conveyance of a vested estate in fee simple." This agreement was bargained for, not merely bequeathed, and relates to a tenancy in common. A greater degree of latitude in how owners of a property interest might restrict alienation is logical, compared to a bequeath of a fee simple estate.

In summary, the trial court properly held that the restriction agreement did not constitute an illegal restraint on alienation; therefore, petitioner's motion for summary disposition in that regard was properly granted because respondent's defense was not valid.

C.  UNTIMELY ENFORCEMENT OF PURCHASE OPTION

The trial court concluded that petitioner was entitled to exercise his purchase option arising from the restriction agreement.  We disagree.

As our Supreme Court long ago explained:

> An option is not a contract of purchase; it is simply a contract by which the owner of the property agrees with another that he shall have a right to buy the property at a fixed price within a specified time.  An option is but an offer, strict compliance with the terms of which is required; acceptance must be in compliance with the terms proposed by the option both as to the exact thing offered and within the time specified; otherwise the right is lost. [*Bailey v Grover*, 237 Mich 548, 554-555; 213 NW 137 (1927).]

Mere "substantial compliance with the terms of the option is not sufficient to constitute an acceptance of the offer."  *Beecher v Morse*, 286 Mich 513, 516; 282 NW 226 (1938).

In *Weinburgh v Saier*, 303 Mich 640, 641; 6 NW2d 921 (1942), the issue involved the reformation of a land contract.  The plaintiff had discovered that the property at issue consisted of "much less than 8 acres," even though he was paying for 8 acres.  *Id*. at 644.  The plaintiff "told [the] defendant he would settle up on the correct basis, and in turn was told to pay the full amount stated in the contract, or else the contract would be immediately forfeited."  *Id*.  The trial court had ruled that "plaintiffs should not be called upon to pay interest after January 1, 1937, as they were willing to pay the entire amount if proper corrections were made, but defendant refused and threatened immediate foreclosure."  *Id*.  Our Supreme Court held:

> The trial court found that tender, if made, would have been refused, and there is ample evidence to support this finding.  This being so, tender was excused, and the payment of interest thereafter suspended.  "The law does not require a useless formality.  A formal tender is not necessary where a party has shown by act or word that it would not be accepted, if made."  [*Id*. at 645, quoting *Mahnk v Blanchard*, 233 AD 555, 561; 253 NYS 307 (1931).]

In *Hobart v Vanden Bosch*, 256 Mich 686, 687; 240 NW 1 (1932), the issue involved the unlawful conversion of bank stock trust shares.  The plaintiff had already paid $938.50 of the price for the shares.  When he later offered the balance of $126.90, it was refused and the shares not given to him.  *Id*. at 688-689.  On several occasions after this, the plaintiff demanded the shares and was refused.  *Id*. at 689-690.  One of the defendants' challenges was "the sufficiency of plaintiff's tender of payment."  *Id*. at 692.  The Supreme Court did not clarify what the defendants had found insufficient, but held that the defendants could not hide behind this reasoning because they would not have accepted any form of tender:

> It is undisputed that plaintiff at the time he demanded his stock . . . , and before the receivers were appointed, was ready and willing to pay the balance of the purchase price, and, in fact, tendered his check in payment at the time.  There is no claim by appellants that a more technically perfect tender of payment if made would have been accepted at that time or at any subsequent time after the receivers were

appointed. That such tender, if made, would not have been accepted is established by this record. Under such circumstances, a further tender would have been idle, and is not required in law. [*Id*.]

The case of *Hanesworth v Hendrickson*, 320 Mich 577, 578; 31 NW2d 726 (1948) concerned a "suit for specific performance of an agreement to sell real estate . . . ." The plaintiffs paid $500 up front, with $10,200 still to be paid. *Id*. "[W]ithin the time provided for performance and before [the] plaintiffs demanded performance, [defendant] Hendrickson definitely informed plaintiffs that defendants would not surrender possession of the property." *Id*. Even when testifying later, defendant Hendrickson still refused to deliver possession. *Id*. at 579. Nevertheless, the defendants argued as a defense that the plaintiffs had not tendered the balance of the payments for the real estate. *Id*. at 578. The Supreme Court held that "[u]nder such circumstances a tender of the purchase price by plaintiffs would have been an idle ceremony and the fact that plaintiffs did not make such tender cannot be asserted as a defense. . . . Obviously if tender had been made it would not have been accepted . . . ." *Id*. at 578-579. Further, in their complaint the plaintiffs indicated that they had been and remained ready and willing to complete the transaction as set forth in the agreement. *Id*. at 579. The Supreme Court held that this did constitute "tender of performance." *Id*.

In this case, the restriction agreement does contain broad language about allowing only the types of transfers specifically enumerated in it. The only situations for which it specifies detailed procedures are for the death of a party, an offer to buy, an involuntary transfer, and a voluntary transfer to another original party. These different provisions have different rules for the number of days an option will be available. That is, it is important to determine the nature of the situation in order to determine the specific applicable rules. Notably absent are the very situations involved with Kathleen's transfer to herself and Virgil, and Virgil's transfer to respondent: voluntary conveyances for no consideration. The trial court simply stated that the agreement actually did prevent Kathleen's transfer, without providing detailed analysis concerning why this was so. But, on appeal, respondent accepts that the agreement, if found reasonable, did not allow Kathleen's transfer. Respondent thus waived any argument to the contrary.

The parties and the trial court agree that Kathleen's transfer was therefore void under the agreement. If petitioner had timely objected, the transaction would have been voided and the property would have remained in Kathleen's sole possession, eventually passing to her estate. Petitioner does not appear to dispute respondent's contention that Kathleen's estate passed everything, including the subject property, to Virgil in any event, leaving petitioner the opportunity to exercise his option to purchase upon Virgil's death. The option language required him to "serve notice in writing of such election upon the deceased Party's personal representative and/or trustee." No tolling for appointment of the personal representative is mentioned. Petitioner does not contest respondent's assertion that it was known immediately after Virgil's death that respondent would be the personal representative.

But petitioner did not attempt to exercise an option until May 10, 2021, at the earliest— that was the date his request for sale was signed, but it was neither formally filed, nor apparently received by respondent, until May 21, 2021. The timeline of possible events giving rise to an objection, or to exercise of an option, was as follows: Kathleen's transfer on December 21, 2016, Kathleen's death on February 26, 2017, Virgil's transfer on June 15, 2018, and Virgil's death on

-14-

January 31, 2021. As noted, the most generous amount of time that the agreement allows to exercise an option is 90 days. And that is only if an original party has died, the other parties take the full 60 days to decide that they do not want to buy as a group, and then the party that does decide to buy alone takes the full 30 days allowed to serve notice in writing to the personal representative. The parties have not presented any evidence concerning any discussion between Linda and petitioner about their decision to buy collectively. If Linda was clearly not going to be a group buyer, for example, then the applicable time limit would have been even smaller. But even under the most generous assumption, that Linda and petitioner considered a group buy for the full 60 days, May 1, 2021, was the last possible date by which petitioner had to give notice to respondent in respondent's capacity as Virgil's personal representative. Petitioner failed to meet that deadline. The option terms for tender require only that written notice be served on the personal representative. That is, petitioner needed to give a simple notice in writing to his brother. Yet petitioner does not assert that he even orally informed respondent in time.

Petitioner's primary excuse for missing the deadline is that serving written notice would have been pointless, because respondent would have contested it. There is caselaw standing for the proposition that, where performance would be a useless formality, performance is excused. See *Hanesworth*, 320 Mich at 578-579; *Weinburgh*, 303 Mich at 644-645; *Hobart*, 256 Mich at 692. The common thread in that caselaw is defendants who refused the plaintiffs' payments, then complained that they did not receive tender. The analogous situation here would be if respondent told petitioner to not even bother sending him written notice of exercising the option, and then later presented as a defense the lack of written notice. That is obviously not what happened. Much more relevant caselaw indicates that providing notice, regardless, remains a crucial way of signaling the intent to exercise an option. Again, exercising an option requires "strict compliance" and must be done "within the time specified; otherwise the right is lost." *Bailey*, 237 Mich at 554-555. By providing timely notice, petitioner would have been preserving his rights, even if a dispute and litigation were to follow. Under petitioner's conception of the law, contractual deadlines could properly be ignored when an objection and legal dispute over the action would follow. While he missed the deadline by at least 9 days, petitioner appears to take the stance that he could have missed it by any amount of time and still preserved his option, because respondent was going to oppose his claim.

As discussed above, this deadline was particularly important because restraints on alienation are subject to a reasonableness review. See *LaFond*, 226 Mich App at 451. Part of what made the instant restraint on alienation reasonable was that 90 days was the actual maximum amount of time to exercise an option: if notice of it was not received by then, the option right expired. Petitioner's position removes this clear line, and renders nebulous the amount of time that an interest holder under the agreement might assert an option. This conception of the option deadline would very likely render the restriction agreement unreasonable and illegal. The restriction agreement grants valuable option rights to petitioner, if he follows the clearly specified procedure. It is inconsistent for petitioner to stress so greatly the benefits that the restriction agreement was supposed to give him, while minimizing his failure to meet its simple requirement for those benefits. Petitioner must be held to the applicable deadline.

The trial court justified petitioner's failure to act after Kathleen's death by describing how Kathleen had already clouded title to the subject property. But petitioner's own position appeared to be that he had not planned to attempt to buy the property at that time, regardless of the status of

title. The trial court's decision offered two alternatives: return the property to Kathleen's estate, or return it to Virgil's estate. Even offering the first alternative was unusual, given that petitioner did not request going back that far. Petitioner was focused only on buying the property from Virgil's estate. The trial court stated that petitioner's rights to purchase the property were not extinguished when the option after Kathleen's death ran out. This was accurate: as the trial court stated, purchasing it after Virgil's death was also a clear option for petitioner.

But the trial court ended its analysis there, not mentioning the deadline for purchasing after Virgil's death, or that petitioner missed it. This was the more important situation to focus on: petitioner was asking to exercise his option upon Virgil's death, not Kathleen's. The trial court's concern over clouded title was misplaced because it had no effect on petitioner's failure to act timely. Petitioner first chose not to exercise the option on Kathleen's death, apart from any title concern, then failed to act timely after Virgil's death. On appeal, petitioner does not attribute this failure to confusion over clouded title. He does not claim that he did not know respondent would become personal representative. Instead, he argues that he was permitted to claim an option past the deadline if the other party would have contested it even if timely exercised. Petitioner is incorrect. As petitioner points out, the restriction agreement clearly voided Virgil's 2018 transfer. Simply giving notice of his intent to exercise his option was not excused by this void transfer.

We recognize the equitable concerns involved here. Petitioner has invested money and time in the subject property. However, no matter what happens with the 1/3 interest at stake in this case, he will continue to own the 1/3 tenancy in common he had from the beginning, the 20% of Linda's portion he has already been given, and, according to petitioner, the rest of Linda's portion pursuant to her estate plan. The nature of the tenancy in common arrangement ensures that petitioner is not being robbed of property he has invested in. And as long as Linda is alive, the restriction agreement continues to bind any who do become interest holders, continuing to give petitioner an option to later obtain their interests (if he complies with the specified procedures). Petitioner also remains free to offer to buy any portions of the interest that Virgil's will did not bequeath to him. Because Virgil's transfer was invalid under the restriction agreement, the property belongs in Virgil's estate. Distributing the property according to the terms of Virgil's will is the result required by the restriction agreement. This course of action avoids respondent obtaining the property interest by an invalid transfer, or petitioner obtaining it by expired option. It both follows the terms of the restriction agreement, and appears to be the most equitable solution.

Therefore, with regard to petitioner's motion for summary disposition brought under MCR 2.116(C)(9), respondent's defense that petitioner failed to timely exercise his purchase option should have prevailed. Respondent's pleading described how Virgil died on January 31, 2021, that the first notification of petitioner's use of the option was received May 21, 2021, and argued that this meant the option had expired. It therefore clearly met the standard of pleading a valid defense to a claim. See *Slater*, 250 Mich App at 425. Accordingly, the trial court erred by holding that respondent failed to present a valid defense to the contract claim.

However, the parties do not indicate that they agree on what the ultimate result should be if the subject property is returned to Virgil's estate. Reviewing the will, it appears there are two possibilities. If the mentioned "ten (10) acres West of and adjacent to the West line of my homestead farm" is part of the property interest at issue in this case, then adjustments must be made concerning which of the specified schemes applies. If the subject property interest is not

related to this "ten (10) acres West of and adjacent to the West line of my homestead farm," then the property interest simply passes through the residuary provision, to be given in equal parts to the five offspring of Kathleen and Virgil. Because this issue has not been addressed in the trial court, we remand the matter to the trial court for that determination. However, disposition of the property interest should depend on the terms of the will, and not the void deed to respondent. Again, Virgil Hoppert's 2018 deed to respondent is void, and petitioner's contractual option to buy the property interest from the Estate of Virgil Hoppert has expired.

In summary, we affirm the trial court's order to the extent it concluded that the restriction agreement was legal, but we vacate the order to the extent it granted petitioner's motion for summary disposition and held that respondent failed to present a valid defense to the contract claim. This matter is remanded to the trial court to determine the proper disposition of the property interest as a part of the Estate of Virgil Hoppert.

Affirmed in part, vacated in part, and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Brock A. Swartzle
/s/ Mark J. Cavanagh
/s/ Anica Letica